Argued and submitted November 23, 2004, reversed and remanded for reconsideration March 23, 2005

In the Matter of the Compensation of
David A. Johnson, Claimant.

SAIF CORPORATION
and Gilkison & Dad, Inc.,
*Petitioners,*

*v.*

David A. JOHNSON;
Crown Zellerbach Corporation and SAIF Corporation;
Carol's Enterprises and SAIF Corporation; Bridge Creek
Logging and Liberty Northwest Insurance Corporation;
Gross & Son Inc. and Liberty Northwest Insurance
Corporation; Robert Kelley and Liberty Northwest
Insurance Corporation; Barrett Business Services Inc.
and Pinnacle-Sims Inc.; Atchley Brothers Inc.
and SAIF Corporation,
*Respondents.*

02-01105, 02-01104, 02-00468, 02-00467, 02-00466,
02-00358, 01-09283, 01-09282; A122825

108 P3d 662

Jerome P. Larkin argued the cause and filed the brief for petitioners.

Thomas Cary argued the cause for respondent David A. Johnson. With him on the brief was Cary Wing Edmunson, P.C.

Ray Myers filed the brief for respondents Crown Zellerbach Corporation and SAIF Corporation and Carol's Enterprises and SAIF Corporation.

David O. Wilson argued the cause and filed the brief for respondents Bridge Creek Logging and Liberty Northwest Insurance Corporation, Gross & Son Inc. and Liberty Northwest Insurance Corporation, and Robert Kelley and Liberty Northwest Insurance Corporation.

Jerald P. Keene waived appearance for respondents Barrett Business Services Inc. and Pinnacle-Sims Inc.

Dean J. Lederer waived appearance for respondents Atchley Brothers Inc. and SAIF Corporation.

Before Edmonds, Presiding Judge, and Wollheim and Schuman, Judges.

SCHUMAN, J.

**SCHUMAN, J.**

The Workers' Compensation Board, applying the last injurious exposure rule, assigned responsibility for claimant's occupational hearing loss to Gilkison & Dad, Inc. (Gilkison), and its insurer, SAIF. They seek judicial review. Because we conclude that claimant first sought and received medical care when he took an audiogram and obtained a hearing aid and that those events occurred before he was hired by Gilkison, we reverse and remand.

Claimant worked at several jobs for different employers in the logging industry between 1960 and his retirement in 1997 at the age of 60. Each of his jobs exposed him to loud noise, and he began to notice hearing loss in the 1980s. In September 1993, claimant's wife entered a contest sponsored by a commercial hearing aid vendor, Beltone, at the Lane County Fair, and she won a free hearing exam and (if necessary) free hearing aid. She gave her prize to claimant, and he then took a diagnostic test from a Beltone employee who was either an audiologist or licensed hearing aid specialist.[1] The employee determined that claimant suffered bilateral hearing loss and fitted him for the free hearing aid. She also offered to sell claimant a hearing aid for his other ear, but he declined the offer. When the single hearing aid subsequently broke, he did not have it repaired or replaced; he testified that if he had had enough money to replace it, he would have.

Claimant next sought a hearing test in June 2001, when he underwent another audiogram and received follow-up treatment from an otolaryngologist, Dr. Urben. At that time, he had been retired for four years and his most recent employer was Gilkison. In September 2001, another otolaryngologist, Dr. Hodgson, performed an insurer-arranged medical examination. In November 2001, claimant gave notice of his claim for workers' compensation benefits to each of his employers for his bilateral hearing loss. All denied responsibility.

---

[1] The signature line in a document in the record describes the employee's title as "audiologist or hearing aid specialist" and lists her state license number, but it does not disclose whether she was one or the other (or both).

Claimant sought a hearing before an administrative law judge (ALJ) in the Hearings Division of the Workers' Compensation Board (board). Because the claim stemmed from an occupational disease and claimant had worked at a series of jobs that could have been the cause, the ALJ applied the last injurious exposure rule (LIER). Under that rule, liability is presumptively assigned to the most recent potentially causal employer for whom claimant worked or was working at the time claimant first sought or received medical treatment, whichever comes first. *Bracke v. Baza'r*, 293 Or 239, 248, 646 P2d 1330 (1982); *Agricomp Ins. v. Tapp*, 169 Or App 208, 212-13, 7 P3d 764, *rev den*, 331 Or 244 (2000). A presumptively responsible employer may rebut that presumptive responsibility by proving (1) that circumstances of employment at its workplace could not possibly have caused or exacerbated the condition; or (2) that the condition was caused solely by conditions at one or more previous employments. *Roseburg Forest Products v. Long*, 325 Or 305, 313, 937 P2d 517 (1997).

The ALJ determined that claimant's visit to Urben, rather than his visit to the Beltone employee, marked the first time claimant sought or received medical treatment. Because Gilkison was the most recent employer that could have contributed to claimant's hearing loss when claimant visited Urben, the ALJ assigned presumptive responsibility to that company. Gilkison failed to rebut the presumption and was held responsible.

Gilkison appealed to the board, arguing that claimant first sought or received medical treatment when he underwent the audiogram and hearing aid fitting at Beltone in 1993. According to Gilkison, those events constituted the "onset of disability" so as to make claimant's September 1993 employer presumptively responsible for claimant's hearing loss. The board, like the ALJ, determined that the care that claimant received at the Beltone visit did not amount to "medical treatment" and affirmed. Gilkison now seeks judicial review, making the same arguments that it made to the board.[2] Having reviewed the board's legal conclusions for

---

[2] Respondents Crown Zellerbach Corporation and Carol's Enterprises (both insured by SAIF), neither of which would be presumed responsible whether the

errors of law, *Weyerhaeuser Co. v. Hagebush*, 181 Or App 440, 442, 45 P3d 1025 (2002), we reverse and remand.

As the parties and the board recognize, the dispositive question is whether claimant received "medical treatment" from the Beltone employee. Our recent opinion in *Foster Wheeler Corp. v. Marble*, 188 Or App 579, 583, 72 P3d 645, *rev den*, 336 Or 60 (2003), is instructive. In that case, the dispute also concerned responsibility for the claimant's hearing loss, and the issue was whether the claimant sought medical treatment for the purposes of the LIER when he underwent one audiogram "performed at his union hall as part of a general health screening intended to detect asbestos-related problems" and another at the suggestion of a coworker, but took no further action to alleviate the hearing loss. *Id.* at 581. We explained that the administration of those audiograms did not constitute medical treatment, and we clarified what *does* qualify as medical treatment under the LIER:

> "According to *Stedman's Medical Dictionary* 1866 (27th ed 2000), 'treatment' is '[m]edical or surgical management of a patient.' To 'treat' is '[t]o manage a disease by medicinal, surgical, or other measures; to care for a patient medically or surgically.' *Id.* In a similar vein, *Webster's Third New Int'l Dictionary* 2435 (unabridged ed 1993) reports that to 'treat' a patient is 'to care for * * * medically or surgically : deal with by medical or surgical means : give a medical treatment to[.]' 'Medical treatment,' then, involves either ongoing medical care or application of some technique, drug, or other action designed either to alleviate or cure a disease or injury. No 'medical treatment' occurred at claimant's first two audiograms. A union-provided audiogram in 1996, performed as part of a general health screening, confirmed claimant's suspicion that he had suffered hearing loss, as did a second audiogram that claimant took in 1999 in preparation for his retirement. In neither case did he receive any care for his condition. Nobody performed any action designed to cure or alleviate it."

board's order is affirmed or reversed, also argue that the board's order should be reversed and remanded. Respondents Barrett Businesses Services Inc.; Pinnacle-Sims Inc.; and Atchley Brothers Inc. (all insured by SAIF) waived appearance. Respondents claimant, Liberty Northwest Insurance Corporation, and three of its insureds: Bridge Creek Logging, Gross & Son Inc., and Robert Kelley, argue that the board's order should be affirmed.

188 Or App at 583. To have received "medical treatment," the claimant would had to have obtained "either ongoing medical care or application of some technique, drug, or other action designed either to alleviate or cure a disease or injury." *Id.* In the absence of further curative steps, the audiograms alone did not constitute medical treatment for hearing loss.

Subsequently, in *Raytheon Constructors v. Tobola*, 195 Or App 396, 402, 97 P3d 1278 (2004), we held that medical treatment *did* occur when an audiologist administered audiograms and also recommended hearing aids; in that situation, the audiologist took an "action designed to alleviate * * * a disease."

■ In the present case, claimant not only took an audiogram; he also was fitted for a hearing aid, received an appropriate one, and used it until it broke. Under those facts, claimant obtained the "application of some technique, drug, or other action designed either to alleviate or cure a disease or injury." *Foster Wheeler Corp.*, 188 Or App at 583.

Respondent Liberty Northwest argues that claimant did not seek or receive "medical treatment" because, first, the Beltone employee was not licensed to practice one or more of the "healing arts" under ORS 656.005(12)(a), OAR 436-010-0005(28), or *Cook v. Workers' Compensation Department*, 306 Or 134, 143, 758 P2d 854 (1988), and was therefore incapable of providing medical treatment; and, second, claimant received the examination and hearing aid because his wife won them in a promotion.

■ ■ Neither argument is persuasive. Although ORS 656.005(12)(a) defines "doctor" or "physician" as a person licensed to practice in the "healing arts," that definition does not limit the ability to provide "medical treatment" to professionals who possess a medical degree. *See Raytheon Constructors*, 195 Or App at 401 (explaining that chiropractors, psychologists, and audiologists, none of whom possess a medical degree, can provide medical treatment). Further, OAR 436-010-0005(28) defines "medical service provider" as any "person duly licensed to practice one or more of the healing arts." Thus, the person who treated claimant, whether she was a licensed hearing aid specialist or an audiologist,

was a professional duly licensed by the state; the "case history" she prepared for claimant lists her "state or provincial license number" as "971." *See* ORS 681.260 (requirements for audiologists); ORS 694.142(3) (standards of practice for hearing aid specialists); OAR 331-610-0000 to 331-610-0050 (qualifications for hearing aid specialists). In diagnosing bilateral hearing loss, selecting a hearing aid, and fitting it on claimant, she performed a "healing art."

■ Liberty Northwest's second argument also fails. It contends that claimant's sole reason for taking the time to undergo the Beltone audiogram and fitting was because his wife won the services as a prize. Liberty Northwest attempts to make much of the fact that the hearing aid and test were offered apparently as a promotion and that claimant declined to buy a second hearing aid or repair his first when it eventually broke. We are not persuaded that the fact that claimant took advantage of his wife's luck in the drawing precludes him from seeking or receiving medical treatment in the course of redeeming the prize. Claimant knew that he had been suffering hearing loss for several years, and he took the offer "to find out if a hearing aid was really going to help." He visited the hearing aid specialist or audiologist, decided to undergo the audiogram, assented to the hearing aid fitting, and continued to wear the hearing aid, which improved his hearing. Under those facts, claimant both sought and received the "application of some technique * * * designed * * * to alleviate" his injury, hearing loss.

■ Finally, our holding does not run afoul of the policy manifested in the LIER. One of the functions of the rule is to assign liability in occupational disease cases where the claimant is typically exposed to harmful conditions over long periods of time and the disease may be latent or slow to progress. The imposition of liability on a single employer when the disease developed during previous employment may produce a harsh result in a particular case, but it also functions to spread the risk within industries and serves claimants by sparing them the difficulties of apportioning liability. *See generally Runft v. SAIF*, 303 Or 493, 498-501, 739 P2d 12 (1987) (explaining purpose of LIER). Consistent application of the LIER requires the parties to be able to point to a specific date on which the "onset of disability" occurs. Unless the

claimant experiences "time loss" due to the condition, that date is when the condition becomes debilitating enough that the claimant sought or received medical treatment for it, whichever is earlier:

> "[T]he objective in designating a triggering date is to identify a point when a condition generally becomes a disability. As we explained in [*SAIF v.*] *Carey*, '[t]he date when a claimant first sought medical treatment, at least in most cases, has *some objective relationship* to the date when the claimant's condition became a disability, because it is *usually documented.*' 63 Or App at [68,] 70, 662 P2d 781 [(1983)]. Because both the date that a claimant first *seeks* medical treatment and the date that the claimant first *receives* treatment generally have an objective relationship to when the claimant's condition becomes a disability, we believe that it is appropriate to designate a triggering date based on either event, whichever occurs first."

*Agricomp Ins.*, 169 Or App at 212-13 (emphasis on the phrases "some objective relationship" and "usually documented" added). The date on which the claimant seeks or receives medical treatment is no less certain when the claimant visits a licensed hearing aid specialist than when a claimant goes to a physician. Moreover, seeking the care of a hearing aid specialist bears "some objective relationship" to the time when a claimant's hearing loss becomes disabling. We have no reason to doubt that, like a visit to a doctor, a visit to a licensed hearing aid specialist would be "usually documented" and therefore useful for the purposes of the LIER.

In sum, the board erred in determining that claimant did not seek or receive medical treatment for the purposes of the LIER when he underwent the September 1993 audiogram and hearing aid fitting.

Reversed and remanded for reconsideration.